In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2922

JOHN DOE, 3, a minor by DOE 3's
next best friend Doe 2, et al.,

*Plaintiffs-Appellants,*

*v.*

ELMBROOK SCHOOL DISTRICT,
Elmbrook Joint Common School District
No. 21,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-cv-409—**Charles N. Clevert, Jr.**, *Chief Judge*.

ARGUED FEBRUARY 9, 2011—DECIDED SEPTEMBER 9, 2011

Before EASTERBROOK, *Chief Judge*, and FLAUM and
RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. A group of pseudonymous plain-
tiffs, referring to themselves as Does 1 through 9,
brought this action against the Elmbrook School District
("the District") in the United States District Court for

the Eastern District of Wisconsin. They alleged that the District's practice of holding high school graduation ceremonies and related events at a Christian church rented by the District for the occasion violated the Establishment Clause of the First Amendment. They sought preliminary and permanent injunctions, a declaratory judgment and damages. After the district court denied the Does' motion for a preliminary injunction, the parties filed cross-motions for summary judgment. The district court granted the District's motion and denied the Does' motion. The Does now appeal. We hold that, on the record before us, the District's use of the rented church space was neither impermissibly coercive nor an endorsement of religion on the part of the District. Because there was no violation of the Establishment Clause, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. The District

The District is a municipal public school district centered around Brookfield, Wisconsin, a suburb to the west of Milwaukee. Its two major high schools are Brookfield Central and Brookfield East. For part of the last decade or so, Central and East have held their high school graduation ceremonies in the main sanctuary of

Elmbrook Church ("the Church"),[1] a local Christian evangelical and non-denominational religious institution. Central began the practice in 2000, and East followed in 2002; both schools rented the Church for graduation every year thereafter through 2009. For at least some years since 2003, Central also rented the Church's chapel, a smaller room, for its senior honors night. East rented the Sharon Lynne Wilson Center for the Arts, a secular facility, for its honors night.

The impetus to move Central's graduation to the Church seems to have come from the student officers of the senior class of 2000, who believed that the school's gymnasium—the previous venue—was too hot, cramped and uncomfortable. Those attending were packed in; they had to sit on hard wooden bleachers or folding chairs; and there was no air conditioning. Seeking a better alternative, the student officers decided upon the Church, which was much larger than the gymnasium and had more comfortable seats, air conditioning and ample free parking. They presented their idea to

---

[1] The Does refer to the room in which the ceremonies were held as the "sanctuary," but the District insists that it actually is called the "auditorium" and that it is labeled as such. Both parties agree that the Church itself refers to the room variously as the "sanctuary," the "Sanctuary/Auditorium" and the "auditorium." R.65 at 9, ¶ 37. It is clear that the room is a religious venue and that "[t]he Church holds its weekend worship services" there, *id.* ¶ 36. We shall employ the nomenclature in favor of the plaintiffs at this stage of the proceedings.

District Superintendent Matt Gibson[2] and then to the senior class, which voted in favor of the proposal. After the vote, Principal Jim Brisco made the ultimate decision to choose the Church, and Superintendent Gibson approved. A similar process began at East two years later, and Principal Joe Schroeder "eventually adopted the proposal, after a majority of seniors voted for it." R.56 at 12, ¶ 83. Until 2005, each year the students in the senior class participated in advisory votes to choose

---

[2] In September of 1999, the senior class officers sent a letter to Superintendent Gibson making their case for the Church:

> We request that the site of the ceremony be changed to an auditorium in Elmbrook Church . . . . As you know, the graduation ceremony has been held in the Brookfield Central Gymnasium for the past several years. The seating in the Gymnasium is very limited, causing the atmosphere to be very busy and perhaps even chaotic. On top of the crowding, the temperature in the Gymnasium gets extremely hot in the month of June. We feel that the Elmbrook Church will overcome the limitations of space and temperature control, providing ample comfortable seating and an air-conditioned room. The cushioned seats are also much more comfortable in comparison to the hard, wooden bleachers available at school. In addition, there are more than enough parking spaces and excellent handicap facilities available at the church.

R.22, Ex. A at 1. There is no information in the record about how the senior class officers first learned of the Church or its amenities.

between two or three venues. These preliminary selections were made by school officials and senior class officers. The Church was always one of them, and the Church invariably emerged the overwhelming favorite.[3] In 2006, the principals of East and Central determined that holding a vote for the 2007 graduation venue would be pointless and simply selected the Church after it was recommended to them by the senior class officers of the two schools.

Superintendent Gibson and Tom Gehl, a member of the school board since 2005 and president of the school board since 2009, are both members of the Church. The Does have not alleged that Superintendent Gibson or Board President Gehl have engaged in any efforts to steer graduation ceremonies to the Church, nor do they allege that either of these officials has misused his office to benefit the Church or to form a relationship between the District and the Church. There is no evidence that either Superintendent Gibson or Board President Gehl had anything to do with the selection of the Church for graduations, other than Superintendent Gibson's approval of decisions made at the school level.[4]

---

[3] For example, in 2005, ninety percent of seniors at East voted for the Church. Six percent chose the Expo Center, and four percent chose the East gymnasium. R.9 (R.4 Vol. 3), Ex. 97.

[4] Superintendent Gibson was involved, however, in responding to complaints about the District's use of the Church and in coordinating certain aspects of the rental arrangement with Church officials.

With the exception of Mr. Gibson, who has been Superintendent of the District since 1995, the major players on the District's side have changed. Don LaBonte took over as principal of Central in 2005 after two intervening successors to Mr. Brisco.[5] In the same year, Brett Bowers became principal of East when Mr. Schroeder left.[6] The Church charged a standard rental rate to the District, which ran between $2,000 and $2,200 for each graduation exercise, and between $500 and $700 for honors night. Money raised by the senior class of each school covered part of the rental fees, and the District funded the rest through its general revenues, which come from property taxes.

### 2. The Church

The atmosphere of the Church, both inside and outside the sanctuary, is indisputably and strongly Christian. Crosses and other religious symbols abound on the Church grounds and the exterior of the Church building, and visitors encounter these symbols as they drive to the parking lot and walk into the building. Many of these symbols—including a cross on the Church roof and a sign with a cross and the words "ELMBROOK CHURCH"—are visible from the public intersection

---

[5] Mr. Brisco was principal of Central from 1996 to 2002. Two other principals, each with a tenure of a year, succeeded him before Mr. LaBonte's appointment to the job.

[6] Mr. Schroeder was principal of East from 1999 to 2005.

outside the Church. The street names given the drives approaching the Church are "Agape" and "Barnabas." R.7 (R.4 Vol. 1), Exs. 1-28, 1-29.

To reach the sanctuary, visitors must pass through the Church lobby, which also has served as a natural congregation point for graduates and their guests after past graduation ceremonies. The lobby contains tables and stations filled with evangelical literature, much of which addresses children and teens, and religious banners, symbols and posters decorate the walls.[7] In the middle of

---

[7] Some examples from images captured at past ceremonies: Banners hanging on the lobby walls bear the messages "Knowing the Lord of Jubilee," "Children's Ministry: Leading Children to a Transforming Life in Christ," "JESUS" and "LORD OF LORDS." R.7 (R.4 Vol. 1), Exs. 6, 1-12, 1-13, 1-14. An antique-style wooden pushcart labeled "PRAYER" sits in the hallway. *Id.* Ex. 1-17. A polygonal column displays religious pamphlets and a large sign asking, "Puzzled . . . About Where the Church should be Planted?" on one side. *Id.* Ex. 1-23. On another column face is a poster labeled "Summer Godsquad." The poster proclaims, "Hey Jr. Highers! Who Are Your Heroes?" and displays cut-out images of movie characters such as E.T., Buzz Lightyear and Marty McFly, a soccer player, unidentifiable public figures and Jesus. *Id.* Exs. 1-18, 1-19. On one wall, a carved wooden plaque invites those who view it to "'. . . go and make disciples of all nations. . .' Matthew 28:19." R.52, Ex. 172-15. On the walls are literature displays labeled, among other things, "{children}" and "{student}." *Id.* Ex. 172-34. In one corner of the lobby, a table containing a computer and several displays of religious

(continued...)

the lobby is a large, circular desk displaying pamphlets such as "{young adults}," "{couples ministry}," "{middle school ministry}," "{high school ministry}" and "{college ministry}." R.52, Exs. 172-28, 172-29. The District admits that Church members manned information booths that contained religious literature during the 2009 graduation, and a DVD recording of the 2002 ceremony shows people staffing these tables. The District also admits that during the 2002 ceremony, "Church members passed out religious literature in the lobby," R.65 at 19-20, ¶ 86, although neither the District nor the Does divulge further details about how the distribution took place or at whose behest. According to Doe 1, when he attended his older sibling's graduation, "[m]embers of the church, instead of school officials, handed out graduation materials during the ceremony." R.7 (R.4 Vol. 1), Ex. 21 at 2, ¶ 9.

The graduation ceremonies take place on the dais at the front of the sanctuary, where school officials and students with roles in the ceremony are seated. An enormous Latin cross, fixed to the wall, hangs over the dais and dominates the proceedings.[8] The first time Central held its graduation in the sanctuary, the cross was

---

[7] (...continued)
literature sits under a sign labeled "{children & student connect}." *Id.* Ex. 172-31.

[8] "The cross is approximately fifteen to twenty feet tall and approximately seven to ten feet wide." R.56 at 5, ¶ 28.

covered, apparently by accident.[9] During subsequent graduations, the Church refused Superintendent Gibson's requests to veil the cross, in keeping with a general Church policy against covering its permanent religious displays. The Church did agree, however, to remove any non-permanent religious symbols from the dais. The chapel used by Central for its senior honors night also contains a cross.

During the ceremonies, "graduating seniors . . . sit down in the front, center rows of pews of the [sanctuary's] main level." R.56 at 9, ¶ 56. Guests sit in the other pews. The parties agree that "Bibles and hymnal books remain in all the pews," *id.* at 6, ¶ 34, as do a "yellow 'Scribble Card for God's Little Lambs,' a pencil, a donation envelope entitled, 'Home Harvest Horizon: offering to the work of Christ,' " and other religious literature, *id.* ¶ 35. There is no evidence that any of these materials were placed in the pews specifically for the graduation ceremonies.

### 3. The Controversy

Complaints about the District's use of the Church arose soon after the practice began. In 2001, a parent asked the District to stop holding graduation ceremonies at the Church because the parent, a non-Christian, did not

---

[9] According to an email sent by Superintendent Gibson, the cross "was inadvertently veiled by a custodian." R.8 (R.4 Vol. 2), Ex. 42 at 1.

want her child exposed to the Church's alleged teachings about those who do not share its faith.[10] In that same year, the Freedom from Religion Foundation and the American Civil Liberties Union ("ACLU") of Wisconsin voiced objections to the graduation site and asserted that it violated the Constitution. The Anti-Defamation League also objected in 2002, followed by Americans United for Separation of Church and State ("Americans United") in 2007.

A sampling from the series of emails and letters exchanged between objecting parties and the District illustrates the nature of the dispute. In 2002, Superintendent Gibson sent an email to one parent insisting that his only role in the selection of the site was "allow[ing] each decision" made independently by the schools "to stand" and that the decisions "had nothing to do with [his] particular church membership or non-membership." R.8 (R.4 Vol. 2), Ex. 77. The parent's response questioned the veracity of that account and speculated that Superintendent Gibson's membership in the Church played a role in the Church's selection:

> Sorry to say, but every time this comes up you try to obfuscate what your role was. You refuse to take responsibility and that's disappointing.
>
> . . . .

---

[10] Specifically, the parent characterized as "'intensely hateful and violent'" the Church's active promotion of "'the idea that people like [the parent] . . . are going to . . . a Hell-like place undergoing endless torments.'" R.56 at 17, ¶ 113 (alterations in original).

> Had you excused yourself from the decision be-cause of the obvious conflict of interest your mem-bership in the church creates, it is likely cooler heads would have thought this through thor-oughly, sought objective counsel *before the deci-sion was made*, and answered no.
>
> . . . .
>
> How could your membership in the church not have influenced your decision? It made it and still makes it impossible for you to be objective. You have a pronounced allegiance to the church and your religion. It is not only a financial coup for the church to host commencements, but it also brings the church the reflected glory of the state's accomplishment and graduates' accom-plishments . . . .

*Id.*

Another parent's email, on which employees of Freedom from Religion Foundation, the Anti-Defamation League and the ACLU of Wisconsin were copied, raised similar concerns:

> There is an obvious conflict of interest regarding the Church: After all, you are a member. And, after all, the particular Church in question has a direct mission of evangelism. Whether or not evangelism was the motive is irrelev[a]nt. The relev[a]nt point is that you have violated the trust of those in the community who wish to attend a graduate ceremony in a secular, non-church setting.

*Id.* Ex. 36.

In response to an email in 2003, Mr. Gibson observed that he had been superintendent for four years before "the student movement at Brookfield Central to look at alternatives for graduation began" and asked the addressee to "refrain from . . . attributi[ng]" the initiative to him. R.9 (R.4 Vol. 3), Ex. 92. The addressee was unpersuaded: "Well, Matt, regardless of what you say, I am convinced that your membership in the church was the primary factor in the church being okayed as a site for hosting commencements." *Id.* Additionally, the addressee complained that the Church discriminates against non-believers and homosexuals and that it "preaches a fundamentally hateful message," and he speculated that the student vote approving the venue was staged "to make it look like a 'democratic' process." *Id.*

A 2006 letter from a parent to Superintendent Gibson praised the District's increased "sensitivity toward non-Christian students" but requested that the District try to avoid scheduling school events and tests on Jewish holidays and objected to the use of the Church as a graduation venue. R.8 (R.4 Vol. 2), Ex. 37 at 1. In response, Superintendent Gibson sent the letter to Principal Bowers and Principal LaBonte along with a note to "keep the input on Jewish holidays in mind to the extent possible when scheduling" and to put an alternative graduation venue proposed by the parent on the consideration list for ensuing years' graduations. *Id.*

A series of exchanges in 2007 between Superintendent Gibson and Aram Schvey, litigation counsel for Americans United, explored the constitutionality of the

practice. Although he defended the venue, Superintendent Gibson assured Schvey that "there are no references to religion or to the church in the graduation program," that no religious literature would be distributed and that Superintendent Gibson previously has "request[ed] removal of any non-permanent religious banners that may be on stage" and would continue to do so. *Id.* Ex. 40. Schvey appreciated these steps, but he requested that the District cover the cross and "all other religious iconography[,] including permanent banners," or select a secular venue. *Id.* Ex. 42 at 2. Superintendent Gibson responded that the Church "made a policy decision several years ago that [the cross] not be veiled for rentals." *Id.* at 1.

In many of the letters and correspondence, Superintendent Gibson noted that the District was building a new field house that could accommodate graduation ceremonies and had been engaging in efforts to obtain funding to renovate Central's and East's gymnasiums. Although earlier efforts to obtain funding had failed, the public later voted in favor of funding that allowed the District to begin construction and renovation. In 2010, Central and East moved their graduation ceremonies to the District's newly completed field house. Additionally, in July 2009, Principal LaBonte declared his intention to move Central's 2010 honors night to its newly renovated gymnasium; in supplemental briefing before us, the District represented that the promised move had occurred.

### 4. The Does

The plaintiffs are current and former students of District schools and their parents. Doe 1 graduated from either Central or East in 2009. Doe 2 is Doe 1's parent and has an older child whose graduation ceremony was held in the Church four years earlier, as well as younger children who attend Elmbrook schools. One of Doe 2's younger children is Doe 3, who "will graduate from a District high school no later than 2014." Appellants' Br. 17. Does 1 through 3 all attended the graduation ceremonies of Doe 1 and of Doe 2's older child. Does 4 and 9 are the parents of children currently attending schools in the district; their eldest children are expected to graduate from high school in 2016 and 2015, respectively. "Does 5 and 6 are the parents of Does 7 and 8, who graduated from a District high school in ceremonies held at Elmbrook Church in 2002 and 2005, respectively." *Id.* Does 2, 4, 5 and 6 also pay property taxes that go to the District.

What the Does all have in common is that they are not Christians.[11] Those of the Does who attended past gradua-tion ceremonies "felt uncomfortable, upset, offended,

---

[11] Doe 1 "subscribe[s] to a religious faith different from Chris-tianity," R.7 (R.4 Vol. 1), Ex. 21 at 1, ¶ 3, as do Does 2 and 3, *id.* Ex. 22 at 1, ¶¶ 4, 9. Doe 4 is a humanist, R.56 at 21, ¶ 143, "Does 5, 6, 7, and 8 are atheists," *id.* at 22, ¶ 152, and "Doe 9 is non-theistic, chooses not to be involved in religion, and does not subscribe to the religious teachings of Elmbrook Church," *id.* ¶ 154.

unwelcome, and/or angry" because of the religious setting. *Id.* In fact, the setting completely ruined for Doe 5 the experience of his children's graduation ceremonies, some of which he did not attend. Those plaintiffs still in school or with children still in school do not relish the prospect of attending future ceremonies at the Church.

According to the Does, there are many other available venues that the District could use for its graduation ceremonies. Moreover, the Wilson Center could host Central's senior honors night and indeed does host East's. The District already pays the Wilson Center a flat fee each year that allows District schools ample access. The District responds that, although other venues are available for graduation, none is as attractive as the Church, particularly for the price: approximately $2,000 per school per ceremony. However, the Does believe that some of the other venues are roughly equivalent in quality and price.

### B. Proceedings Before the District Court

On April 22, 2009, the Does filed this action against the District and moved simultaneously for a preliminary injunction that would bar the District from holding its 2009 graduation ceremonies at the Church. After the district court denied that motion, the Does filed an amended complaint asking the district court to enjoin permanently the District from holding school events at the Church or, in the alternative, to enjoin permanently the District from using the Church "unless all visible religious symbols [were] covered or removed." R.77 at 2.

They also sought damages and a declaratory judgment. No discovery was taken, and the parties filed cross-motions for summary judgment. The district court denied the Does' motion for summary judgment, granted the District's and dismissed the case.

After determining that the plaintiffs had standing, the district court proceeded to its Establishment Clause analysis. First, the district court held that the District was not engaging in religious coercion of the sort that the Supreme Court held to violate the Establishment Clause in *Lee v. Weisman*, 505 U.S. 577 (1992), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). The district court distinguished those cases on the ground that they "speak to coerced religious participation as opposed to exposure to religious symbols." R.77 at 16. The district court reasoned that, because there was no religious exercise at the Elmbrook graduation ceremonies, there was no coerced religious participation. Relying on *Lee*, it held explicitly that the plaintiffs' "unease and offense at having to attend graduation ceremonies at the Church and face religious symbols, while in no way minor, is not enough." *Id.* at 18.

Second, the district court concluded that the District's use of the Church does not have the primary effect of endorsing religion in violation of the test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "On its face," the district court conceded, "the District's decision to hold graduation ceremonies and the senior honors event holds symbolic force." R.77 at 23. But because "the history and context of the community

and the forum reflect that secular concerns directed the move away from school facilities toward an adequate, convenient, cost-effective graduation venue," a reasonable observer would not understand the events to be an endorsement of the Church or its teachings. *Id.* at 21 (internal quotation marks omitted).

Finally, the district court disagreed with the Does that the use of the Church excessively entangled the District with religion. The court found the rental of the Church to be a standard fee-for-use arrangement and a non-enduring relationship. It also determined that the limited interaction between the District and the Church over the physical setting did not delegate impermissibly to the Church authority over the graduation events. Accordingly, the district court granted summary judgment in favor of the District and dismissed the case.

## II

## DISCUSSION

### A.  Justiciability

In its response brief in this appeal, the District did not contend that the case has been rendered moot by subsequent events. Nevertheless, we have an independent duty to ascertain our jurisdiction, *see In re Repository Techs., Inc.*, 601 F.3d 710, 719 (7th Cir. 2010), and we accordingly ordered supplemental briefing from the parties to address whether the case remains justiciable in light of the completion of the District's field house and of the renovations to Central's and East's gymnasiums. While

this case was pending in the district court, the 2009 graduation took place at the Church as planned. There have been significant changes in the District's activity since then. Central and East both held their 2010 graduation ceremonies in the field house, and neither school has an immediate intention to rent the Church facilities for graduation. Similarly, Central held its 2010 senior honors night in its newly renovated gymnasium rather than in the Church chapel.

As an initial matter, whatever the District's intentions are as to the future, the entire case is not moot because those of the Does who have attended past graduation ceremonies at the Church have live claims for damages. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (stating that a claim for damages "preserve[s]" a court's ability to reach the merits even if claims for forward-looking relief are moot); *Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009). However, those of the Does who have claims for only forward-looking relief must be dismissed from the case if their claims are no longer justiciable.

In its supplemental brief, the District contends that the case is now moot because the District voluntarily has stopped using the Church and does not have any present intention of holding future graduation ceremonies or other events there. A defendant's voluntary cessation of allegedly wrongful conduct ordinarily "does not moot a case or controversy unless 'subsequent events ma[ke] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'"

*Parents Involved in Cmty. Schs.*, 551 U.S. at 719 (alteration in original) (emphasis added) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953). The Supreme Court recently has reaffirmed that the burden of proving that the behavior cannot reasonably be expected to recur is a "heavy" one that lies with the party seeking a determination that the case is moot. *Parents Involved in Cmty. Schs.*, 551 U.S. at 719; *see also Friends of the Earth*, 528 U.S. at 189 ("The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (alteration in original) (quoting *United States v. Concentrated Phosphate Exp. Ass'n, Inc.*, 393 U.S. 199, 203 (1968))); *Lucini Italia Co. v. Grappolini*, 288 F.3d 1035, 1038 (7th Cir. 2002) (stating that "[t]he burden of persuasion that such conduct cannot reasonably be expected to reoccur lies with the defendant" and reversing a district court's decision that a case was moot because "the court did not point to any evidence showing that no reasonable expectation existed that" the conduct would reoccur).

Here, the likelihood that the District will again use the Church for a graduation ceremony—particularly one that the Does themselves will attend—certainly has decreased since the District opened the field house. The Supreme Court has made clear, however, that a likelihood that would be "too speculative to support" a finding of initial standing can be sufficient to defeat an attempt to show mootness caused by voluntary cessation. *See Friends of the Earth*, 528 U.S. at 190.

We believe that the District has not met its burden of demonstrating that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Schs.*, 551 U.S. at 719 (quotation marks omitted). The District did not attempt to establish a case for mootness before the district court, and the record remains relatively bare on the issue other than containing a few scattered representations regarding the District's present intentions. Although we have accepted the repeal of a challenged ordinance or an express disavowal of official policy as sufficient to moot a case, *see, e.g.*, *Wernsing v. Thompson*, 423 F.3d 732, 744-46 (7th Cir. 2005); *Fed'n of Adver. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929-31 (7th Cir. 2003), the District in this case has presented no evidence of a formal or even an informal policy change regarding graduation ceremonies or the use of private facilities for school events. As the Does note, the District has maintained that one of its reasons for using the Church was that it was less expensive than using the District's own facilities. The District has introduced no evidence that the cost disparity has changed, and it is not difficult to imagine that such a disparity would lead District schools back to the Church in the future. Nothing in official policy would prevent or even obstruct the District from changing its mind and immediately returning to the Church. *See Rosales-Garcia v. Holland*, 322 F.3d 386, 395-97 (6th Cir. 2003) (en banc) (holding that a challenge to detention was not mooted by granting of parole because the government made no promise that it would not reinstate detention and could revoke the petitioner's parole "at any time").

The District contends, however, that Superintendent Gibson and the principals of Central and East have represented that they do not intend to use the Church again; in the District's view, these representations suffice to moot the case. We accord special solicitude to the representations of government officials, *see Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 492 (7th Cir. 2004), but here the District has informed us that its official position is not to rule out using the Church in the future should the need arise, Oral Argument (Feb. 9, 2011); *see also* R.65 at 45-46, ¶¶ 197-200. *See Sasnett v. Litscher*, 197 F.3d 290, 291 (7th Cir. 1999) (stating that a representation that the government "has no present intention" to reinstate a challenged ordinance "is far from being an assurance, or even a prediction, that the state will not do so"), *abrogated on other grounds by Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009).[12] Indeed,

---

[12] *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (holding that a city's moratorium on the police use of chokeholds did not moot a case because the moratorium was not permanent); *Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 421 (8th Cir. 2007) (rejecting defendants' contention that case was moot "without any assurance that they will not resume the prohibited conduct"); *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 999 (7th Cir. 2002) (challenge to an ordinance not moot when city "stated that it will 'suspend enforcement' of the provisions only until the 'matter is resolved'"); *Phillips v. Penn. Higher Educ. Assistance Agency*, 657 F.2d 554, 570 (3d Cir.
(continued...)

the District has not stated that it would veto a decision of the individual schools—who, recall, are free to select the venue for graduation events—or a student movement to return to the Church. The Church facilities remain an available venue should any such decision be made. Under these circumstances, therefore, we cannot say that the District has carried its "heavy burden," *Friends of the Earth*, 528 U.S. at 189 (quotation marks omitted), of establishing that its own voluntary cessation of its annual use of the Church makes absolutely clear that the use will not recur.

**B. Anonymous Litigation**

At oral argument, we also ordered supplemental briefing on whether it was proper for the district court to permit the Does to proceed using pseudonyms to protect their anonymity. We review the district court's decision on this matter for an abuse of discretion. *See K.F.P. v. Dane Cnty.*, 110 F.3d 516, 519 (7th Cir. 1997) (stating in dicta that "[t]he use of fictitious names for parties, a practice generally frowned upon, is left within the discretion of the district court" (internal citation omitted)); *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) ("The decision whether to permit parties to proceed

---

[12] (...continued)
1981) ("Present intentions may not be carried out, and, at any rate, they are not controlling on the issue of mootness." (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953))).

anonymously at trial is one of many involving manage-
ment of the trial process that for obvious reasons are
committed in the first instance to trial court discretion.").[13]

"An abuse of discretion occurs if the district court
reaches erroneous conclusions of law or premises its
holding on a clearly erroneous assessment of the evi-
dence." *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010)
(internal quotation marks omitted). In *Pruitt v. Mote*, 503
F.3d 647 (7th Cir. 2007) (en banc), we explained that an
abuse of discretion occurs only if "(1) the record
contains no evidence upon which the court could have
rationally based its decision; (2) the decision is based on
an erroneous conclusion of law; (3) the decision is based
on clearly erroneous factual findings; or (4) the decision
clearly appears arbitrary." *Id.* at 658 (quotation marks
omitted). In situations such as the one before us—an
application of a governing legal framework to the facts—if
the district court "applied the correct legal standard
and reached a reasonable decision based on facts sup-
ported by the record," its decision will stand. *Id.*[14]

---

[13] *See also Plaintiff B v. Francis*, 631 F.3d 1310, 1315 (11th Cir.
2011); *Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185, 186-87
(2d Cir. 2008); *United States v. Microsoft Corp.*, 56 F.3d 1448,
1464 (D.C. Cir. 1995) (per curiam).

[14] *See also Wolf v. Kennelly*, 574 F.3d 406, 410 (7th Cir. 2009) ("As
the Supreme Court has pointed out, . . . '[a] district court would
necessarily abuse its discretion if it based its ruling on an
erroneous view of the law or on a clearly erroneous assess-
ment of the evidence.'" (second alteration in original) (quoting
*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990))).

It is very well established that anonymous litigation is "disfavor[ed]," *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005), and should be permitted only under exceptional circumstances. *See Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004). "The public has an interest in knowing what the judicial system is doing, an interest frustrated when any part of litigation is conducted in secret." *Smith*, 429 F.3d at 710. Under our precedent, however, "[t]he presumption that parties' identities are public information, and the possible prejudice to the opposing party from concealment, can be rebutted by showing that the harm to the [party requesting anonymity] . . . exceeds the likely harm from concealment." *Doe v. City of Chicago*, 360 F.3d at 669.

The District, for "strategic reasons," did not oppose the Does' motion. Oral Argument, *supra*. Nevertheless, the district court had "an independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts." *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997). The court always has the independent duty to consider the public interest in knowing fully the work of the courts. Our review is, of course, limited to the record before the district court at the time it made the decision. *See Pruitt*, 503 F.3d at 659.

In granting the Does' motion, the court said, "I've not received any objection to [the Does'] request and find no legal impediment to granting the plaintiff[s'] request of that, to be allowed to proceed utilizing pseudonyms." R.89

at 3-4. We previously have expressed concern when district courts have granted a motion to proceed anonymously without explaining their grounds for doing so. *See Smith*, 429 F.3d at 710 (remanding to the district court to explore propriety of litigating anonymously where district court "granted [the plaintiff's] application to do so without discussing this circuit's decisions"); *Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d at 872 (stating that although a district court's granting of an unopposed motion to litigate anonymously without an accompanying explanation "was entirely understandable given the absence of objection and the sensitivity of psychiatric records, . . . the privilege of suing or defending under a fictitious name should not be granted automatically even if the opposing party does not object"). It is important that a reviewing court be confident that the court actually engaged in the careful and demanding balancing of interests required in making this determination.

The record before us does not suggest that the district court did anything other than carefully consider the matter. Notably, the request was made by formal motion submitted on May 12, 2009, seventeen days in advance of its ruling. The motion set forth the pertinent authorities and was supported by detailed affidavits. There is no indication that the district court did not thoroughly study the motion, including its discussion of the pertinent legal authorities, which make clear that the court has an obligation to balance carefully the privacy/security concerns of the litigants against the right

of the public to be informed fully about litigation in the United States courts. We have noted that a factor in favor of upholding a ruling is the submission of a thorough motion that "cited the appropriate cases," thereby making the court "aware of the proper standard." *Wolf v. Kennelly*, 574 F.3d 406, 411 (7th Cir. 2009); *see also id.* ("The district court was thus aware of the proper standard for fees and appeared to use it in reaching its decision."). We shall not assume that a district judge, in the fulfillment of his or her high responsibilities, does not read and give considered attention to the motions that are presented by the litigants in the course of litigation. *See United States v. Dote*, 328 F.3d 919, 924 n.3 (7th Cir. 2003) (stating that we "presume the district court read the briefs submitted during the [sentencing] proceedings" (alteration in original) (quotation marks omitted)); *Ross Bros. Constr. Co. v. Int'l Steel Servs., Inc.*, 283 F.3d 867, 872 (7th Cir. 2002) ("[W]e must presume the district court read the briefs submitted during the summary judgment proceedings, where the parties spent a substantial amount of time arguing over the scope of the lawsuit . . . ."). Nothing suggests that the district court performed in anything but the expected conscientious manner. Furthermore, the court, by the time it ruled on the motion, had become quite familiar with the litigation. In addition to the pleadings, it had received the brief and exhibits in support of a preliminary injunction and the brief in opposition and its exhibits. It also had the stipulation of uncontested facts filed by the parties.

Moreover, the basis for the district court's decision is clear from the record.[15] The Does' motion was supported by sworn declarations from eight of the plaintiffs. They testified that they and their children had suffered reprisals in the past—including from teachers, school officials and workplace supervisors—for airing their views on religion and that they feared future reprisals should their involvement in the litigation become public knowledge. In addition, the Does attached comments posted in an online community forum after this lawsuit was filed. Most of the comments merely reflect the overheated rhetoric common to passionate debate about

---

[15] We have affirmed unexplained or incompletely explained rulings when the grounds for the decision were " 'apparent on the record,'" *Local 232, Allied Indus. Workers of America v. Briggs & Stratton Corp.*, 837 F.2d 782, 788 (7th Cir. 1988) (quoting *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1084 (7th Cir. 1987)). *See Wolf*, 574 F.3d at 410-11 (denial of attorney's fees); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 408 (7th Cir. 1998) (denial of discovery sanctions); *Ross v. City of Waukegan*, 5 F.3d 1084, 1087-88 (7th Cir. 1993) (affirming a "three-line minute order" denying leave to file an amended complaint and stating that "[a]lthough a more plenary explanation of the matter would have significantly aided us in our evaluation . . . , we cannot fault the trial court for going to the heart of the matter"); *Local 232, Allied Indus. Workers of America*, 837 F.2d at 788 (affirming denial of sanctions motion and stating that "[a]lthough we welcome a district court judge's explanation every time a Rule 11 motion is decided, we believe that . . . the reasons for its denial are apparent on the record").

significant social issues, but a few comments do raise legitimate concerns, including one comment that the Does' views "[s]ound[] like the Muslim attitude of hating all Christians and wanting to do away with them," that the appropriate response is to "do them in before they do you in" and suggesting that the conflict between supporters and detractors of the District's use of the Church is "a war of survival." R.19, Ex. 139 at 22, 23.[16] We have

---

[16] *See also* R.19, Ex. 139 at 3 ("If forced to move[] to a hot crowded gym, then the 330+ families can discuss their displeasure with the 9 families who filed the lawsuit, if these cowards would identify themselves!"); *id.* at 5 ("I also agree that the cowardly families who are participating in this lawsuit should be named."); *id.* at 7 ("Also, why is the coward hiding . . . if you're so proud of your cause, step forward and receive your just recognition."); *id.* at 13 ("It amazes me that 9 malcontents who don't have the balls to identify themselves can disrupt what should be a joyous occasion for so many."); *id.* at 14 ("And so the plaintiff(s) requested to keep their names hidden; had they not, imagine the consequences, not only for the parents, but for the students listed under the suit."); *id.* at 18 ("Please find a way to publish the names of the local (nine?) families who are attempting to force THEIR minority opinions on the majority . . . I for one would like to attend my granddaughter's graduation at Elmbrook Church without this hassle. I already pay outrageous taxes to this District and REALLY would like to know and be able to confront these few individuals who think they should decide for all of us . . . ." (alterations in original)); *id.* ("The 'Americans United for the Separation of Church and State' are

(continued...)

stated that "[t]he danger of retaliation is often a com-pelling ground for allowing a party to litigate anony-mously." *Doe v. City of Chicago*, 360 F.3d at 669. Lawsuits involving religion can implicate deeply held beliefs and provoke intense emotional responses. Although there is no evidence of actual violence arising out of this particular suit, the district court was not required to disbelieve the Does' uncontradicted accounts of past retaliations against them and their children or to give the online postings an innocent construction in order to reject the Does' motion. The district court's assessment of the seriousness of the potential danger faced by the plaintiffs is certainly entitled to significant deference by this court. District judges sitting in communities throughout the vast area included within our circuit are far more familiar with the customs and practices of in-dividual communities and far better situated to assess accurately the "temperature" of public discourse in those communities. Those of us who review cold records in our appellate chambers must exercise great circumspec-

---

[16] (...continued)
simply a bunch of anti-religious bigots who want to use the harassment of lawsuits to remove any trace of religion from public life. They need to be fought by every means possible."); *id.* at 22-23 ("I do have EXTREME PREJUDICE against a reli-gious group such as the Muslims that want to do away with ALL Christians, [y]ou bet[]. Call it what you want. The golden rule here prevails, do them in before they do you in. . . . I would have to presume at this point the only way you would get shot in a war of survival would be in the back.").

tion in evaluating the estimation of our colleagues in the district court in these matters.

It also is significant that children are involved in the suit. *See id.* at 669 (stating that a plaintiff had failed to present an adequate case for anonymity in part because the plaintiff was "not a minor"); *Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185, 190 (2d Cir. 2008) (stating that an important factor in the balancing inquiry is "whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of his age" (internal citations omitted)). Although Doe 1 is no longer a minor, Doe 1's sibling Doe 3 is, and Does 2, 4 and 9 currently have minor children attending District schools. Identifying these adult plaintiffs also would expose the identities of their children. Because the subject matter of the suit frequently has a tendency to inflame unreasonably some individuals and is intimately tied to District schools, such a risk to children is particularly compelling. *See Sealed Plaintiff*, 537 F.3d at 190 (listing as a factor in favor of anonymity "'whether identification poses a risk of retaliatory physical or mental harm to the . . . party [seeking to proceed anonymously] or *even more critically, to innocent non-parties*'" (alterations in original) (emphasis added) (quoting *James*, 6 F.3d at 238)).

The district court was entitled to conclude that the Does' interest in privacy, supported in the record, outweighs the public's interest in totally transparent judicial proceedings to the extent that the Does need not divulge their real names. *See Lindsey v. Dayton-Hudson Corp.*, 592

F.2d 1118, 1125 (10th Cir. 1979) (ruling that a district court did not abuse its discretion in denying leave to proceed anonymously without explanation where the grounds for the denial were clear). There also is no indication that litigating anonymously will have an adverse effect on the District or on its ability to defend itself in this or future actions. Thus, although we reiterate our concern that courts articulate their reasons for granting or denying a motion to proceed anonymously, under the standards set forth in *Pruitt*, 503 F.3d 647, we hold that, in this case, the district court did not abuse its discretion in granting the motion.

## C.  Establishment Clause

We review a district court's decision to grant summary judgment de novo, making all reasonable inferences in favor of the nonmoving party. *Groesch v. City of Springfield*, 635 F.3d 1020, 1022 (7th Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Establishment Clause of the First Amendment to the Constitution of the United States, made applicable to the actions of state and municipal governments by the Fourteenth Amendment, *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947), provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The three-pronged test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971),

"remains the prevailing analytical tool for the analysis of Establishment Clause claims." *Books v. City of Elkhart* (*Books I*), 235 F.3d 292, 301 (7th Cir. 2000); *see also Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010) (applying the *Lemon* test), *petition for cert. filed*, 79 U.S.L.W. 3578 (U.S. Mar. 21, 2011) (No. 10-1191); *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 527 (7th Cir. 2009) (same). Under the *Lemon* test, a governmental practice violates the Establishment Clause if it (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; *or* (3) fosters an excessive entanglement with religion. *See Lemon*, 403 U.S. at 612-13. Here, the Does maintain that the practice of holding high school commencement ceremonies and honors convocations in the rented sanctuary of a church violates the Establishment Clause in several ways: It coercively imposes religion on graduates and their families; it communicates a message of governmental endorsement of religion; it confers control over the physical setting of public school events to a religious entity; it directs tax funds to support the propagation of religion; and it arises out of divisive student votes. We shall discuss each of these contentions in the course of our analysis.

### 1. Coercion

The Does submit that the District's use of the Church constitutes governmentally coerced participation in religion in contravention of the principles of *Lee v. Weisman*, 505 U.S. 577 (1992). In *Lee,* the Supreme Court

of the United States held that the delivery of a non-sectarian prayer at a high school graduation ceremony violated the Establishment Clause because it indirectly coerced students to join in on a state-directed religious exercise. The Court stated, "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.* at 587 (alteration in original) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)).

Although the exact relationship of the principle announced in *Lee* to the *Lemon* test is unclear,[17] we need not

---

[17] Some courts have understood *Lee* to announce a new, somewhat limited coercion test that should be applied independently of *Lemon*. *See, e.g.*, *Modrovich v. Allegheny Cnty.*, 385 F.3d 397, 400 (3d Cir. 2004) (holding the coercion test inapplicable to a challenge to a Ten Commandments plaque in a courthouse); *Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 285 (5th Cir. 1999) (stating that an alternative to the *Lemon* test, "which the Court set forth in *Lee*, is the so-called 'Coercion Test,' under which school-sponsored religious activity is analyzed to determine the extent, if any, of its coercive effect on students"); *cf. Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 7 & n.14 (1st Cir. 2010) (describing the *Lemon* test, the "endorsement analysis" and the "coercion analysis" as "three interrelated analytical approaches" and noting the "abundance of commentary from courts and others as to the relationship between these three analytical ap-

(continued...)

resolve that issue today. *See Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 7 & n.14 (1st Cir. 2010), *cert. denied sub nom. Freedom from Religion Found. v. United States*, ___ S. Ct. __, No. 10-1214, 2011 WL 1322972 (U.S. June 13, 2011). The legal principles that we must apply to resolve the question before us are clear. "[W]hen a plaintiff claims that the state is coercing him or her to subscribe to religion generally, or to a particular religion, only three points are crucial: first, has the state acted; second, does the action amount to coercion; and

_____

[17] (...continued)

proaches" (internal quotation marks omitted)), *cert. denied sub nom. Freedom from Religion Found. v. United States*, ___ S. Ct. ___, No. 10-1214, 2011 WL 1322972 (U.S. June 13, 2011). Yet, as Justice Blackmun's concurring opinion in *Lee* demonstrates, it is conceptually possible to view coercion as part of an inquiry into the primary effect or the message of endorsement sent by a practice. *See Lee v. Weisman*, 505 U.S. 577, 604 (1992) (Blackmun, J., concurring) ("Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or promoting religion."). Some courts therefore have examined the coercive nature of a government practice in determining its primary effect. *See Does 1, 2, 3, 4, & 5 v. Enfield Pub. Schs.*, 716 F. Supp. 2d 172, 185-86 (D. Conn. 2010) (citing cases taking different approaches but holding that "[b]oth because it seems a more focused approach, and because it appears to be in accordance with the Second Circuit's view, the court will address 'coercion' as one indication of effect . . . and not as an entirely separate inquiry" (citing *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 411 (2d Cir. 2001))).

third, is the object of the coercion religious or secular?" *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir. 1996).

The Does contend that graduates and other attendees are coerced into participating in religion in two ways. First, they are compelled to enter a "sacred space." Appellants' Br. 29. In their view, entering such a space is in itself a religious activity: "Even when no formal religious worship service is underway, a church (and especially its sanctuary) remains an inherently religious setting— the physical embodiment of the faith community it shelters—and so, to many faiths, a house of worship and all its constituent parts are objects of veneration." *Id.* Second, attendees are coerced into "view[ing] prominent religious iconography within [the Church], including a cross that continually looms above the dais where the ceremonies take place." *Id.* at 33. The Does and amici submit that symbols can convey persuasive messages, often very effectively, and coerced exposure to religious proselytization conveyed by the state or its partners is no less offensive to the Establishment Clause when done through symbols rather than through prayers or Bible readings.

Although the anti-coercion principle expressed in *Lee* goes to the very heart of Establishment Clause concerns, the district court correctly concluded that its strictures were not violated here. *Lee* is part of a long line of cases "dealing with government efforts to 'coerce anyone to support or participate in religion or its exercise,' the essence of [which] is that the state is somehow forcing a person who does not subscribe to the religious tenets

at issue to support them or to participate in observing them." *Kerr*, 95 F.3d at 477 (quoting *Lee*, 505 U.S. at 587). Those cases often have involved prayer exercises or religious instruction in public schools, *see, e.g.*, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) (invalidating Bible readings and recital of the Lord's Prayer in schools); *Engel v. Vitale*, 370 U.S. 421 (1962) (invalidating government-composed school prayer program), but they also have reached other settings and other forms of religious compulsion, *see, e.g.*, *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) (striking down a religious test oath requirement for holding public office and stating that "neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief in any religion" (internal quotation marks omitted)). *Lee*'s innovation was not in its announcement of the principle that the state may not coerce religious belief or participation, but in its more particular holding, confirmed in *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 310-12 (2000), that the special vulnerability of children, subtle social pressures and the positions of authority held by teachers and school officials might indirectly coerce students into subscribing to a religious belief or practice even where the state has not employed a direct threat of force or punishment to compel compliance. *See Kerr*, 95 F.3d at 477-79 (describing the Court's jurisprudence); *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 411-13 (2d Cir. 2001) (same).

Thus, although we have held that *Lee* prohibits schools from compelling students to sit through proselytization efforts by religious groups during school hours, *Berger v.*

*Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1169-71 (7th Cir. 1993), we also have held that *Lee* prevents a prison from requiring an inmate to participate in a substance abuse rehabilitation program "organized around" the acknowledgment of a belief in God and meetings that included group prayers, *Kerr*, 95 F.3d at 474-75, 480, and that a police chief may not pressure a subordinate "to bring her thinking and her conduct into conformity with the principles of his own religious beliefs," *Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997).

We do not doubt that symbols can be used to proselytize or that, in the appropriate circumstances, coerced engagement with religious iconography and messages might take on the nature of a religious exercise or forced inculcation of religion. *See Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 661 (1989) (Kennedy, J., concurring in the judgment in part and dissenting in part) (recognizing that "[s]peech may coerce in some circumstances" and that "an obtrusive year-round religious display [of a cross on city hall] would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion"); *Berger*, 982 F.2d at 1170 (holding that the coercion principle was violated where students were forced to listen to private speakers exhorting them to read the Bible). However, the Establishment Clause does not shield citizens from encountering the beliefs or symbols of any faith to which they do not subscribe. *See Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 759 (7th Cir. 2001); *Tanford v. Brand*, 104 F.3d 982, 986 (7th Cir. 1997). It thus was significant in *Lee* that the students felt

coerced, although subtly, to join in the observance of the invocation and thereby give the impression of adherence.

On this record, however, graduates are not forced—even subtly—to participate in any religious exercise "or other sign of religious devotion," *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 445 (7th Cir. 1992), or in any other way to subscribe to a particular religion or even to religion in general. They are not forced to take religious pamphlets, to sit through attempts at proselytization directed by the state or to affirm or appear to affirm their belief in any of the principles adhered to by the Church or its members. Instead, the encounter with religion here is purely passive and incidental to attendance at an entirely secular ceremony. The record does not support the inference that students would appear to be, or would feel themselves to be, participating in a religious exercise or subscribing to the beliefs of the Church. The concerns in *Lee* are simply inapposite to the environment described in this record. *See Santa Fe*, 530 U.S. at 312 (holding that "the delivery of a pregame prayer has the improper effect of coercing those present to participate in an *act of religious worship*" (emphasis added)); *Lee*, 505 U.S. at 598 (noting that "the State has in every practical sense compelled attendance and participation in an *explicit religious exercise*" (emphasis added)); *Freedom from Religion Found.*, 626 F.3d at 13 (holding the coercion inquiry inapplicable to the Pledge of Allegiance because, unlike in *Lee*, silence does not give the impression of "an expression of participation in the Pledge"); *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 407 (4th Cir. 2005) ("[A]lthough religious exer-

cises in public schools, even if voluntary, may violate the Constitution because they can indirectly coerce students into participating, nothing in any of the school prayer cases suggests the same analysis applies when the challenged activity is not a religious exercise."); *Berger*, 982 F.2d at 1170 (stating that the distribution of Gideon Bibles in a school violates the principles of *Lee* because "the act of accepting a Bible in front of other students, with the option of returning it later privately or choosing not to read it, signals accord with the Gideons' beliefs").

Moreover, because there is no indication that the background iconography is in any way associated with the District, that the District directed students to look at the images or that the District even pointed out the images, the general impressionability of the students does not carry the same weight in the analysis. *See Santa Fe*, 530 U.S. at 305 (finding that "the 'degree of school involvement' makes it clear that the pregame prayers bear 'the imprint of the State and thus put school-age children who objected in an untenable position'" (quoting *Lee*, 505 U.S. at 590)); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 116 (2001) (stating that although the Court noted in *Edwards v. Aguillard*, 482 U.S. 578 (1987), "that mandatory attendance requirements meant that the state advancement of religion in a school would be particularly harshly felt by impressionable students[,] . . . [it] did not suggest that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue"); *Tanford*, 104 F.3d at 986 (upholding the delivery of an

invocation at a university commencement because "the special concerns underlying . . . *Lee* [were] absent").

The lack of association of the iconography with the District is also helpful in analyzing the Does' contention that entering a house of worship is a religious activity because some people consider the act to carry religious significance. Entering a church may be of religious significance to some, but it is not an inherently religious activity of the sort proscribed by *Lee*.[18] Students, indeed all citizens in a pluralistic society, encounter religion and religious symbols in myriad ways in the course of daily life. These occasions are incidental to other human activity, and members of the community do not regard them, in the normal course of daily life, as requiring any active affirmation or participation on their part. The community accords them respect because of their meaning to some of our fellow citizens, and sometimes they are incorporated into our culture as

---

[18] The Does and amici observe that the adherents of some faiths are prohibited by their beliefs from entering the place of worship of a different faith. Under the proper circumstances, such an objection could raise a claim under the Free Exercise Clause, *see Otero v. State Election Bd. of Oklahoma*, 975 F.2d 738, 741 (10th Cir. 1992), but the subjective beliefs of some individuals do not automatically render all who enter a church for a secular purpose participants in an objectively religious activity.

reflections of society.[19] The more appropriate analysis is to determine whether there is any impermissible governmental endorsement of religion. As we shall explain more fully below, we undertake this analysis by examining whether the purpose, design, context and implementation of the encounter with the religious symbol in fact conveys such an impermissible message of state endorsement.

We are confirmed in our approach to this analysis by the Supreme Court's own approach to cases involving state-facilitated displays of religious iconography or religious messages; to address such questions the Court has used the *Lemon* test or asked directly if there is an impermis-

---

[19] *See Edwards v. Aguillard*, 482 U.S. 578, 593-94 (1987); *see also O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1230 (10th Cir. 2005) ("The Establishment Clause . . . does not compel the removal of religious themes from public education.")*; Books v. Elkhart Cnty.* (*Books II*), 401 F.3d 857, 868 (7th Cir. 2005) (stating that "[t]he Establishment Clause is not violated when government teaches about the historical role of religion" and distinguishing between historical instruction and proselytization); *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 444 (7th Cir. 1992) (noting that "[s]tudents not only read books that question or conflict with their [religious] tenets but also write essays about them and take tests—questions for which their teachers prescribe right answers, which the students must give if they are to receive their degrees"); *see generally Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 347 (5th Cir. 1999) (describing permissible uses of "religion and religious concepts" in school curricula).

sible endorsement rather than employing an independent coercion inquiry to analyze state-facilitated displays of religious iconography or religious messages. *See, e.g.*, *McCreary Cnty. v. ACLU of Kentucky*, 545 U.S. 844 (2005) (Ten Commandments display in courthouse); *Cnty. of Allegheny*, 492 U.S. 573 (majority opinion) (crèche and menorah displays on government property); *Edwards*, 482 U.S. 578 (law requiring teaching of creationism in schools); *Lynch*, 465 U.S. 668 (crèche erected by city in a private park); *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam) (display of Ten Commandments on classroom walls); *see also Milwaukee Deputy Sheriffs' Ass'n*, 588 F.3d 523 (sheriff inviting religious group to speak to subordinates); *Books v. Elkhart Cnty.* (*Books II*), 401 F.3d 857, 868 (7th Cir. 2005) (Ten Commandments display on courthouse lawn); *Books I*, 235 F.3d 292 (same). We therefore turn to the *Lemon* test to guide the remainder of our analysis.

### 2. Endorsement

The Does do not contend that the District was motivated predominantly by a religious purpose in selecting the Church as the venue for its graduations and honors convocations. We therefore may pretermit any discussion of the purpose prong of the *Lemon* test and focus our inquiry on the effect and entanglement prongs.

With respect to the effect prong, we ask, in the context of this case, "irrespective of government's actual

purpose, whether the practice under review in fact conveys a message of endorsement or disapproval." *Sherman ex rel. Sherman*, 623 F.3d at 517 (quotation marks omitted); *see also Cnty. of Allegheny*, 492 U.S. at 592. We make this assessment from the perspective of "a reasonable person, apprised of the circumstances surrounding the [practice]" and "familiar with the history of the government practice at issue." *Milwaukee Deputy Sheriffs' Ass'n*, 588 F.3d at 528 (quotation marks omitted).

According to the Does, the setting of the graduation ceremony inherently conveys a message of endorsement because it creates an unavoidable symbolic link between the Church and the District: "[T]he holding of a school event in a church sanctuary, where an immense cross is displayed in conjunction with school banners and above school speakers, sends an unmistakable message of union between religion and government." Reply Br. 13.

At the outset, we cannot accept the Does' assertion that we should approach this case with an eye to determining whether *all* graduation ceremonies held in places of worship *necessarily* convey a message of endorsement. The established principle that "Establishment Clause jurisprudence remains a delicate and fact-sensitive one," *Lee*, 505 U.S. at 597, requires that we engage in a highly fact-specific evaluation that avoids bright lines that proscribe entire areas of interaction and conduct. *See, e.g.*, *McCreary Cnty.*, 545 U.S. at 867 (explaining that a prior case "did not purport to decide the constitutionality of every possible way the [Ten] Commandments might be

set out by the government, and under the Establishment Clause detail is key"); *Lynch*, 465 U.S. at 678 ("In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed."); *Books II*, 401 F.3d at 867 ("'Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.'" (quoting *Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 127 (7th Cir. 1987))); *Cmty. Consol. Sch. Dist. 21*, 980 F.2d at 444 ("The religion clauses of the first amendment do not establish general rules about speech or schools; they call for religion to be treated differently.").

This fact-specific approach is necessary not only to ensure that permissible church-state relationships are permitted to exist, but also to ensure that we remain vigilant and sensitive to those encounters that do convey a message of state endorsement. For instance, following this fact-specific approach, in many cases we have noted the special danger of endorsement that religious displays at the seat of government might convey. We have articulated in those cases a substantial concern that such displays are "likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Am. Jewish Cong.*, 827 F.2d at 127 (quotation marks omitted); *see also Harris v. City of Zion*, 927 F.2d 1401, 1412 (7th Cir. 1991) (stating that a Latin cross on a municipal seal "presents to any observer a clear endorsement of all those beliefs associated with a Latin cross in violation of the Establishment Clause").

Consistently, both our cases and the governing precedent from the Supreme Court have counseled that we be particularly sensitive to what Justice Jackson, albeit in another context, referred to as "the practicalities and peculiarities of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). For example, in *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993), the Court held that public school teachers may provide specialized instruction to students in religious schools without necessarily sending a message of endorsement. *Zobrest* therefore "repudiated" the assumption "that the presence of a public employee on private school property creates an impermissible 'symbolic link' between government and religion." *Agostini v. Felton*, 521 U.S. 203, 224 (1997). "[W]ithout more," *id.* at 227, the Court later explained, such an assumption is unfounded and "smack[s] of antiquated notions of 'taint,'" *id.* at 223 (quotation marks omitted). *See also Books II*, 401 F.3d at 869 (holding that, despite "the symbolic force of exhibiting a religious text at the seat of government," a Ten Commandments display did not have the primary effect of advancing religion because in context it communicated an acknowledgment of history and tradition, not of religious approval); *Books I*, 235 F.3d at 306-07 (examining the format, setting and surroundings of a Ten Commandments monument in determining that it sent a message of endorsement); *Am. Jewish Cong.*, 827 F.2d at 127-28 (stating that "the critical inquiry is whether, considered in its unique physical context, the nativity scene at issue in this case communicates a message of government endorsement"). With this

approach firmly in mind, we now turn to an examination of the record in this case.

The Does present ample evidence that the Church is indeed a highly religious and unmistakably sectarian setting. Christian symbols and messages are permanent aspects of the building's structure and decoration; non-permanent religious messages are present in the lobby and remain in the pews during the graduation ceremony. No one could fail to notice the giant cross that hangs over the dais and "appears in attendees' line of sight when they watch" the ceremony. R.56 at 5, ¶ 28. In short, an objective observer undoubtedly would be aware of the religious nature of the setting.

Yet the Does offer no evidence to suggest that the District has in any way associated itself with these symbols or with the beliefs expressed by the Church or that any of the religious messages—the materials in the pews, for instance—were placed there especially for graduations rather than being standard fare for the Church's own activities. Indeed, the content of the graduation ceremonies and the speeches always has been entirely secular. As such, an objective observer would understand the religious symbols and messages in the building and on Church grounds to be part of the underlying setting as the District found it rather than as an expression of adherence or approval by the school. Indeed, the record demonstrates that the graduates, and by implication many other members of the audience, such as their parents, knew affirmatively that the Church simply had been rented for the occasion as

the preferred venue of the participating graduates. The record also shows that the venue is rented regularly to other groups in the community in need of a similar facility for their gatherings. The observer also might be aware of efforts taken by the District to minimize the religious nature of the setting by securing the removal of non-permanent displays from the dais of the sanctuary, efforts that further distance the District from the Church's message. "[W]ithout more," *Agostini*, 521 U.S. at 227, the District's use of a religious facility for a secular purpose does not irretrievably create a symbolic link tainting the association of the two entities.

In *ACLU of Illinois v. City of St. Charles*, 794 F.2d 265 (7th Cir. 1986), a case involving a cross erected on a city water tower, we stated that, "[w]hen prominently displayed on a *public* building that is clearly marked as and known to be such, the cross dramatically conveys a message of governmental support for Christianity, whatever the intentions of those responsible for the display may be." *Id.* at 271 (emphasis added); *see also Am. Jewish Cong.*, 827 F.2d at 128 ("Because City Hall is so plainly *under government ownership and control*, every display and activity in the building is implicitly marked with the stamp of government approval." (emphasis added)); *Bronx Household of Faith v. Bd. of Educ.*, ___ F.3d ___, No. 07-5291, 2011 WL 2150974, at *9 (2d Cir. June 2, 2011). The crucial difference here, however, is that *City of St. Charles* and similar cases involved religious displays and activity on *public* property. Because the government is presumed to control its own property, including any displays, iconography or messages deco-

rating it, religious displays often convey a strong message that the government endorses the beliefs expressed in the decorations. *See Books I,* 235 F.3d at 306. By contrast, when the government merely makes temporary use of a private setting—especially a rental for one day—an observer would not understand the message necessarily to have been made by, created at the direction of or expressed with the approval of the state.

The Does nevertheless contend that the District would not have used the Church and would not have rejected complaints of offense were it not comfortable with the Church and its message. *See* Reply Br. 15 ("[R]egardless of how the Church compares with other options, District leaders surely would not have approved use of the Church if they had been uncomfortable with its religious nature or message themselves."); Appellants' Br. 43 ("Very likely, if the graduations had been held in a mosque replete with Islamic symbols, and the complaints had come from the Christians who make up the vast majority of the school community, the District's leaders would have moved the graduations long before this litigation was filed." (internal citation omitted)). Such argumentation is speculative and obscures the crucial analytical question: whether the District's actions *endorsed* the Church's religious practices and beliefs. Moreover, the Establishment Clause does not require the District to refrain from all business relationships with a church or other religious group simply because some observers are offended by the group's beliefs or, indeed, by religion in general. *See Lee,* 505 U.S. at 597 ("We do not hold that every state action implicating religion

is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation."); *Linnemeir*, 260 F.3d at 759 (refusing to halt performance of a blasphemous play at a university because "[t]he government's interest in providing a stimulating, well-rounded education would be crippled by attempting to accommodate every parent's hostility to books inconsistent with their religious beliefs").

In this case, the District has not sponsored any religious ceremony or display; instead, it has rented a building. There is no realistic endorsement of religion by the mere act of renting a building belonging to a religious group, especially when the venue is rented to other groups on a regular basis.

The remainder of the Does' evidence also does not establish that the District's conduct has the primary effect of endorsing religion. For example, the Does observe that Superintendent Gibson and Board President Gehl are both members of the Church, which, they believe, sends a message of favoritism. To that end, they point to *Does 1, 2, 3, 4, & 5 v. Enfield Public Schools*, 716 F. Supp. 2d 172 (D. Conn. 2010), which held that the staging of graduation in a church violated the Establishment Clause. In *Enfield*, however, there was significant evidence that a school district official and a religious group actively lobbied the school board to steer the graduation to the church *because* it was a church. *See id.* at 193-95. Viewed in context, the court held, the decision

hardly could fail to convey a message of endorsement. By contrast, in this case the Does present no evidence of a similar effort. Quite the opposite: With the exception of Superintendent Gibson's approval of the decisions made by the individual schools, neither official had anything to do with the selection of the Church. Mr. Gehl did not even join the school board until several years after Central first rented the Church. The most the Does can say is that Superintendent Gibson's failure to veto the school-level decisions after receiving complaints betrays bias.[20] The significance of such a supposed conflict-of-interest pales in light of the utter lack of any religious purpose underlying the District's decision and the overwhelming evidence that the District desired to make use only of the Church's material amenities. The evidence in the record establishes that the District selected the Church for entirely secular reasons. Students and officials alike desired a venue with more amenities than East's or Central's gymnasiums, which were hot, crowded and uncomfortable. The student officers proposed—and subsequent classes repeatedly selected—the Church, which, although not the only adequate venue, is by all accounts a superior one. It is within the school district; it has ample free parking, air conditioning

---

[20] *See* Appellants' Br. 43 ("And even if the membership of District leaders in the Church was not the main reason the District's graduations were moved to the Church, surely those Church memberships make it difficult, if not impossible, for District leaders to be truly objective in assessing complaints about the use of the Church for the graduations.").

and comfortable seating; and, at approximately $2,000 per graduation, its price is lower than that of many other venues. Even using the school gymnasiums apparently would have been more expensive. *See* R.22 at 3, ¶ 12.

We next address the Does' assertion that the District's use of the Church excessively entangles the state with religion by allowing the Church to control the setting and atmosphere of a school ceremony, by embroiling the District in discussions about removing religious symbols from the sanctuary, by using government funds to support the Church and by fostering divisiveness within the school community. Whether considered as an independent prong of the *Lemon* test or as an aid to determining the primary effect of a practice, the entanglement question requires the District to establish " 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Vision Church, United Methodist v. Vill. of Long Grove*, 468 F.3d 975, 995 (7th Cir. 2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 393 (1990)). The "Court '[has] always tolerated some level of involvement between' the state and religion," and " '[e]ntanglement must be excessive before it runs afoul of the Establishment Clause.'" *Nelson*, 570 F.3d at 881 (alterations in original) (quoting *Agostini*, 521 U.S. at 233) (internal quotation marks omitted). We have described as "[t]he general rule . . . that, to constitute excessive entanglement, the government action must involve intrusive government participation in, supervision of, or inquiry

into religious affairs." *Vision Church*, 468 F.3d at 995 (quotation marks omitted).

In this case, there is no evidence that the Church or its members have attempted to control or influence the setting or the content of the ceremony, and there is no evidence that the District used graduation events as a way to get the Church's message out.[21] Any interaction between the Church and the District regarding the setting is too de minimis to cause any real concern. *See id.* (stating that "the advancement or inhibition of religion must be more than de minimis"); *see also Bronx Household of Faith*, 2011 WL 2150974, at *14 ("Without doubt there are circumstances where a government official's involve-

---

[21] Although it is undisputed that, in 2002, someone handed out religious literature in the lobby, the Does make no allegations and present no evidence that the person handing out literature was affiliated with Church leadership or with the District or that the practice was encouraged, condoned or continued in later years by the District. Without more, such an isolated incident does not send a message that the District endorses the Church or its beliefs, nor does it result in sponsorship or active involvement with the affairs of the Church. Relatedly, although the presence of Church officials at information booths in the lobby could be problematic if those booths actively had been used to distribute religious literature or to proselytize, the Does again present no evidence that the persons manning the booths actually did so. Without any such evidence, there is no way to infer that the staffers were stationed there to proselytize rather than to give directions to attendees.

ment in matters of religious doctrine constitutes excessive government entanglement. But it does not follow . . . that the mere act of inspection of religious conduct is an excessive entanglement." (internal citation omitted)); *Otero v. State Election Bd. of Oklahoma*, 975 F.2d 738, 740-41 (10th Cir. 1992) (holding that the use of a church as a polling place did not result in an excessive entanglement with religion where the church provided "a conveniently located place that can accommodate the voting public" and there was no showing "that an excessive rent [was] being paid . . . or that the defendants are attempting to promote a particular religion"). The district court also concluded that the use of taxpayer funds to rent the Church was not impermissible because it was a standard fee-for-use arrangement. We agree. Additionally, the District's requests that the Church remove religious symbols from the dais—done at the behest of the Does—does not by itself result in the sort of intrusive supervision and interference by government authorities that could come even close to the level of excessiveness. *See Agostini*, 521 U.S. at 233. We also cannot accept the Does' contention that submitting the choice of venue for graduation to an advisory student vote provides an impermissible occasion for creating division along religious lines. The election here is over the choice of venue for a secular public high school academic ceremony. No one suggests that the content of the ceremony was anything other than secular. The vote here is therefore a far cry from the vote at issue in *Santa Fe* to determine whether to have a religious invocation and to select a student to deliver

the prayer. There, the school policy "invite[d] and encourage[d] religious messages." *Santa Fe*, 530 U.S. at 306.

Finally, we emphasize that our conclusion in this case rests on the record before us. Indeed, the parties represented at oral argument that they had agreed to proceed to summary judgment without taking any discovery. As we have explained, however, Establishment Clause cases are decided on their unique circumstances, and, if we are to remain faithful to the direction of the Supreme Court and to our own case law, we must decide the case on the record before us. Whether a practice violates the Establishment Clause is largely a legal issue, but it is a legal issue that is highly dependent on the facts of each case. Here, the Does present no evidence that the District sponsors the Church's beliefs or mission. The record before us therefore does not permit a conclusion that the District's choice of venue has the effect of conveying a message of endorsement of the Church or its views or results in an enduring and tangled relationship between the District and the Church. Accordingly, the district court properly granted summary judgment in favor of the District on the Does' Establishment Clause claim.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED

FLAUM, *Circuit Judge*, dissenting in part. I agree that the plaintiffs have standing and that the district court committed no error by allowing them to proceed anonymously. Similarly, as a general matter, I take no issue with the majority's reliance on *Lemon v. Kurtzman's* framework for resolving establishment clause cases. *See* 403 U.S. 602, 612-13 (1971).[1] Of course, the touchstone for establishment clause challenges remains "the principle that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion." *McCreary County Kentucky, v. ACLU*, 545 U.S. 844, 860 (2005) (quotation marks omitted). The determination is case-specific: whether a particular practice violates the establishment clause is "in large part a legal question to be answered on the basis of judicial interpretation of social facts" which "must be judged in their unique circumstances." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000).

I believe that conducting a public school graduation ceremony at a church—one that among other things featured staffed information booths laden with religious literature and banners with appeals for children to join "school ministries"—runs afoul of the First Amendment's establishment clause as applied to the states via the

---

[1] One of our panel members has observed that the *Lemon* framework is like an opera star that "go[es] on singing after being shot, stabbed, or poisoned." *United States v. Booker*, 375 F.3d 508, 516 (2004) (Easterbrook, J.).

Fourteenth Amendment's due process clause.[2] In my view, that conclusion is consistent with well established doctrine prohibiting school administrators from bringing church to the schoolhouse. *E.g.*, *People of State of Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, Illinois,* 333 U.S. 203, 211-12 (1948) (religious instruction in public schools held unconstitutional). The same result should obtain when administrators bring seminal schoolhouse events to a church—at least to one with the proselytizing elements present in this case. The constitutional flaw with such activity is that it necessarily conveys a message of endorsement. Moreover, the Supreme Court's "coercion cases," *Lee v. Weisman*, 505 U.S. 577 (1992) and *Santa Fe,* cannot be meaningfully distinguished—both because endorsement is intrinsically coercive and because there was coerced activity in this case.

Establishment clause jurisprudence has long guarded against government conduct that has the effect of promoting religious teachings in school settings, and the case law has evinced special concern with the receptivity of school children to endorsed religious messages. In

---

[2] Although I focus my discussion on the school district's practice of holding graduation ceremonies at Elmbrook Church, I believe that the same constitutional defects inhere in the district's use of the church for awards ceremonies. *See Santa Fe*, 530 U.S. at 311 (reasoning that conducting invocations at high school football games did not escape the teachings of *Lee v. Weisman* because extracurricular activities are "part of a complete educational experience").

*Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), for in-
stance, the Supreme Court barred enforcement of a Ken-
tucky statute requiring the posting of a copy of the Ten
Commandments on the wall of each public school class-
room within the state. The Court's brief discussion con-
cluded that the statute ran afoul of *Lemon*'s first prong,
whether the legislation had a secular purpose. *Id.* at 41
(concluding that the purpose for posting the command-
ments was "plainly religious in nature"). In reaching
that conclusion, the Court entered into a discussion of
*Lemon*'s second prong, whether the primary effect of
government conduct advances or inhibits religion. The
Court reasoned that "[i]f the posted copies of the Ten
Commandments are to have any effect at all, it will be
to induce the school children to read, meditate upon,
perhaps to venerate and obey, the commandments." *Id.*
at 42. I perceive essentially the same problem in the
circumstances of this case.

Displaying religious iconography and distributing
religious literature in a classroom setting raises constitu-
tional objections because the practice may do more
than provide public school students with *knowledge* of
Christian tenets, an obviously permissible aim of a
broader curriculum. *E.g.*, *Edwards v. Aguillard*, 482 U.S. 578,
608 (1987) (Powell, J., concurring). The concern is that
religious displays in the classroom tend to promote
religious beliefs, and students might feel pressure to
adopt them. The concern was front and center in *Stone*
and apparent to one degree or another in the Supreme
Court's school prayer cases. *See Wallace v. Jaffree*, 472
U.S. 38 (1985) (Alabama law authorizing a moment of

silence for meditation or voluntary prayer held uncon-
stitutional); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S.
203 (1963) (opening exercises featuring Bible recitation and
reading of Lord's prayer held unconstitutional); *Engel v.
Vitale*, 370 U.S. 421 (1962) (prescribed daily prayer held
unconstitutional). The same problem attends pervasive
displays of iconography and proselytizing material at a
public secondary school graduation.

In this case, high school students and their younger
siblings were exposed to graduation ceremonies that put
a spiritual capstone on an otherwise secular education.
Literally and figuratively towering over the graduation
proceedings in the church's sanctuary space was a 15- to
20-foot tall Latin cross, the pre-eminent symbol of Chris-
tianity. That symbol "carries deeply significant meaning
for those who adhere to the Christian faith." *Salazar v.
Buono* 130 S. Ct. 1803, 1836 n. 8 (2010) (Stevens, J., dis-
senting). Moreover, it is a symbol that invites veneration
by adherents. *E.g.*, 2 St. Thomas Aquinas, SUMMA
THEOLOGICA, q. 25, art. 3 at 2157 (Benzinger Bros., 1947).
The cross, like many symbols, is "pregnant with expressive
content." *See Texas v. Johnson*, 491 U.S. 397, 405 (1989). It
acts as a "short cut from mind to mind," *West Virginia
State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), for
adherents who draw strength from it and for those who
do not ascribe to Christian beliefs. Although the setting
in which a symbol is displayed can shape its message,
*cf. Buono*, 130 S. Ct. at 1811 (plurality opinion) (stating
that the purpose and intent of a Latin cross placed on
an outcropping in the desert was "to honor American
soldiers who fell in World War I"), there is no doubt that

a sectarian message is conveyed by a cross prominently displayed in a house of worship. *See also McCreary County*, 545 U.S. at 868 (stressing the importance of the context in which a "contested object appears") (quoting *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 (1989) (opinion of Blackmun, J.)); *Van Orden v. Perry*, 545 U.S. 677, 701 (2005) (Breyer, J., concurring) (discussing contexts in which Ten Commandments displays might appear).

What is more, Elmbrook Church's sizeable cross was not the only vehicle for conveying religious messages to graduation attendees. Upon passing through the exterior doors of the church, attendees proceeded into a lobby that contained numerous religious materials. Those materials included pamphlets for "middle school" and "high school" ministries. The middle school ministry pamphlet stated, "We are calling students to live and love like Jesus." As the majority reports, *ante* at 7 n. 7, a poster on the wall asked, "Hey Jr. Highers! Who Are Your Heroes?" and depicts pop culture icons alongside Jesus Christ. Anticipating the desired answer to the poster's question, there were several stations indicating that children and students (there were labels) could obtain religious literature tailored to them. Among the banners that have been draped from the lobby's ceiling during graduation ceremonies is one that read "Children's Ministry: Leading Children to a Transforming Life in Christ." Moreover, all 360 degrees of the lobby's substantial, circular information booth were stocked with religious pamphlets. It was staffed during at least some of the school district's graduation cere-

monies, and the literature was readily accessible even without the staff presence. Returning to the sanctuary itself, which is where the ceremonies took place, the pews were supplied with Bibles, hymnals, and additional informational literature. Children in attendance could find "scribble cards" in the pews on which "God's Little Lambs" could draw. Anyone could partake of the cards soliciting membership in the church. During at least one graduation ceremony, church members passed out religious literature directly to audience members. Put simply, the environment was pervasively Christian, obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church.

Regardless of the purpose of school administrators[3] in choosing the location, the sheer religiosity of the space created a likelihood that high school students and their younger siblings would perceive a link between church and state. That is, the activity conveyed a message of endorsement. High school graduations enjoy an iconic

---

[3] *Lemon*'s purpose inquiry has rarely proved dispositive, *McCreary County*, 545 U.S. at 859, and the favorable features of the church, such as its space and comfort, do not drive the ultimate inquiry into the constitutionality of its use as a high school graduation venue. *See Lemon*, 403 U.S. at 625 (noting that though taxpayers have been spared considerable expense through the teaching efforts of churches, the "benefits of these schools . . . are not the issue . . . . The sole question is whether state aid to these schools can be squared with the dictates of the Religion Clauses").

place in American life. *Lee*, 505 U.S. at 583. Given their centrality, the presence of religious iconography and literature is likely to prove particularly powerful, indicating to everyone that the religious message is favored and to nonadherents that they are outsiders. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 n.1 (1989) (quoting *Wallace*, 472 U.S. at 38 (O'Connor, J., concurring)). Here, the church was not just adorned with its own symbols, it was draped in the high schools' decorations. Banners for the high schools were displayed in the lobby and in the sanctuary, mixed in with the church's religious decor and literature. In the sanctuary, the high schools' names were projected onto a large screen adjacent to the Latin cross. Combined with presence of the Church's pamphlets for its "school" ministries, the setting would have implied to nonadherents in attendance that the school district placed its imprimatur on Elmbrook Church's message. *See Santa Fe*, 530 U.S. at 307-08 (remarking on the intermixing of an invocation with the accouterments and hallmarks of high school life and concluding that "the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration").

The Supreme Court's decisions in *Lee* and *Santa Fe* cannot be meaningfully distinguished on the ground that the school district did not coerce overt religious activity. *Lee*, 505 U.S. at 605 n.6 (Blackmun, J., concurring) (observing that as a practical matter "any time the government endorses a religious belief there will almost always be some pressure to conform"). First, coercion has

never been the *sine qua non* of an establishment clause violation. *Santa Fe*, 530 U.S. at 313-14 (noting that coercion was not the Court's sole concern and that the establishment clause may be "eroded" in "myriad, subtle ways"); *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 786 (1973). Moreover, although *Lee* and *Santa Fe* focus on the problem of coerced religious *activity*, it is a mistake to view the coercion at issue in those cases as divorced from the problem of government endorsement of religion in the classroom generally. In fact, they are two sides of the same coin: "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Wallace*, 472 U.S. at 60 n.51 (alteration omitted) (quoting *Engel*, 370 U.S. at 430). And government efforts at shaping religious views may prove effective over time. *Lee*, 505 U.S. at 592; *cf. also A Letter to Richard Burke, Esq., on Protestant Ascendency in Ireland*, in vol. VI WORKS OF THE RIGHT HONORABLE EDMUND BURKE 395 (rev. ed. 1866) ("Man and his conscience cannot always be at war."). The fact that graduation attendees need not do anything but participate in the graduation ceremony and take advantage of religious offerings if they so choose does not rescue the practice.

What is more, there is an aspect of coercion here. It is axiomatic that "[n]either a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will . . . ." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947). The

first principle is violated when the government directs students to attend a pervasively Christian, proselytizing environment. *Cf. County of Allegheny*, 492 U.S. at 664 (Kennedy, J., concurring in part and dissenting in part) (observing in the context of crèche displays that "[p]assersby who disagree with [their] message[s] . . . are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech"); *Wallace*, 472 U.S. at 72 (O'Connor, J., concurring) (noting that under an appropriately crafted moment of silence law a student "who objects to prayer . . . is not compelled to listen to the prayers or thoughts of others"). Once the school district creates a captive audience, the coercion inherent in endorsement can operate. When a student who holds minority (or no) religious beliefs observes classmates at a graduation event taking advantage of Elmbrook Church's offerings or meditating on its symbols (or posing for pictures in front of them) or speaking with its staff members, "[t]he law of imitation operates," *Wallace*, 472 U.S. at 60 n.51, and may create subtle pressure to honor the day in a similar manner. *See also id.* at 81 (O'Connor, J., concurring) (where children are concerned, government endorsement "is much more likely to result in coerced religious beliefs"). The only way for graduation attendees to avoid the dynamic is to leave the ceremony. That is a choice, *Lee v. Weisman* teaches, the establishment clause does not force students to make. *See also McCreary County*, 545 U.S. at 881-82 (O'Connor, J., concurring) ("Free people are entitled to free and diverse thoughts, which government ought neither to constrain nor to direct.").

The effect of endorsement created by the school district's practice is not diminished by the explanation that the space was rented and school officials could exercise less control over the church than they could over a schoolhouse. The argument provides only superficial appeal. The point appears most cogent with respect to the church's cross, although the church possessed means of covering the symbol. The point appears less cogent with respect to other aspects of the church which might have been easily modified to render the space more inviting to others. This mode of distinguishing, however, would have us look at the issue of control in an exceedingly narrow manner. The critical facts should be that school administrators effectively required attendance, because graduations are not truly optional, *see Lee*, 505 U.S. at 595, and selected the venue. *See Abington Twp.*, 374 U.S. at 222 (the neutrality required by the establishment clause aims at preventing church and state from acting in concert such that government support is "placed behind the tenets of one or of all orthodoxies"); *cf. also Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993) (no establishment clause concern for church group to use school space for an event where the district created a public forum and the event would have taken place outside of school hours and without school sponsorship). Nor is the effect diminished by the administrators' mechanism for choosing the graduation site. The record indicates that, following the results of student elections, the principals of the high schools made the ultimate decisions on where to hold graduation. A "student election does

nothing to protect minority views but rather places the students who hold such views at the mercy of the majority." *Santa Fe*, 530 U.S. at 304; *see also McCreary County*, 545 U.S. at 884 (O'Connor, J., concurring) ("[W]e do not count heads before enforcing the First Amendment.").

None of this is to suggest that school officials should have exercised a higher degree of control over the church's environment, scrubbing it of religious symbols or working to tailor its message to a secular audience. Such a course would have run afoul of *Lemon's* excessive entanglement prong. *See Bowen v. Kendrick*, 487 U.S. 589, 615-18 (1988). Instead, school administrators should have examined the space that students voted for and recognized that it was not an appropriate location for holding a public high school graduation ceremony.

In sum, if constitutional doctrine teaches that a school cannot create a pervasively religious environment in the classroom, *Wallace*, 472 U.S. 38; *Stone*, 449 U.S. 39; *Abington Twp.*, 374 U.S. 203; *Engel,* 370 U.S. 421, or at events it hosts, *Santa Fe*, 530 U.S. 290; *Lee,* 505 U.S. 577, it appears overly formalistic to allow a school to engage in identical practices when it acts as a short-term lessee. *Lee*, 505 U.S. at 595 ("Law reaches past formalism."). The same risk that children in particular will perceive the state as endorsing a set of religious beliefs is present both when exposure to a pervasively religious environment occurs in the classroom and when government summons students to an offsite location for important ceremonial events.

Determining that the school district operated outside permissible constitutional bounds should not be equated with expressing hostility toward Elmbrook Church or its beliefs. The First Amendment, via its free exercise clause, guarantees that government will not impinge on the freedom of individuals to celebrate their faiths, in the day-to-day, or in life's grand moments. Without question, that is a desirable goal. Whether the event is a meal, a graduation, or a funeral, a signpost or a diversion, sincerely held religious beliefs can remind one to give thanks, spur reflection, or provide emotional rescue in dark days. Religion can lead one to perform works that benefit the community or meditate on what it means to live the good life. Secular belief systems, of course, can serve those ends, too, *e.g.*, Aristotle, NICHOMACHEAN ETHICS (J. E. C. Welldon trans., 1923); Seneca, *On the Shortness of Life*, in I AD LUCILIUM EPISTULAE MORALES 322 (Richard M. Gummere trans., 1918), and the establishment clause reinforces the promise of the free exercise clause by prohibiting the government from influencing how a person relates to the universe. "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Lee*, 505 U.S. at 592; *see also McCreary County*, 545 U.S. at 883 (O'Connor, J., concurring).

I conclude that the practice of holding high school graduation ceremonies at Elmbrook Church conveys an impermissible message of endorsement. Such endorsement is inherently coercive, and the practice has had the unfortunate side effect of fostering the very divisive-

ness that the establishment clause was designed to avoid. Therefore, I respectfully dissent.